# EXHIBIT A

ATTESTATION DU PROFESSEUR DELEBECQUE AU SOUTIEN D'UNE « MOTION TO DISMISS »

SUR LE FONDEMENT DE LA THEORIE DU « FORUM NON CONVENIENS »

1. Je, soussigné, Philippe Delebecque, Professeur à l'Université de Paris-I (Panthéon-Sorbonne)[1] ai été consulté par les conseils de la Société *International Lease Finance Corporation* (ci-après ILFC) assignée par certains prétendus ayants droit des victimes du crash du vol Yemenia IY 626. Il m'a été demandé d'établir une déclaration au soutien d'une « motion to dismiss » sur le fondement de la théorie du « forum non conveniens » présentée par ILFC.

2. Après examen des pièces qui m'ont été communiquées, à savoir :

- ordonnance de référé du TGI de Paris du 16 oct. 2009 ;

- ordonnance de référé du TGI d'Aix-en-Provence du 30 avril 2010 ;

- ordonnance de référé du TGI de Paris du 8 septembre 2010 ;

- ordonnance de référé du TGI de Paris du 6 octobre 2010 ;

- arrêt de la Cour d'appel d'Aix-en-Provence du 17 février 2011 ;

- ordonnance de référé du TGI de Paris du 8 juin 2011 ;

- ordonnance de référé du TGI d'Aix-en-Provence du 12 juillet 2011 ;

- assignation de certains ayants droit des victimes devant District Court of California (second amended complaint),

je suis en mesure de faire la déclaration suivante, en précisant que je suis prêt à venir témoigner si cela m'était demandé.


I. Faits


3. Le 30 juin 2009, un Airbus A 310 exploité par la compagnie Yemenia et propriété de ILFC s'est écrasé en mer au large des Comores avec 142 passagers à bord et 11 membres d'équipage. Pour la plupart d'entre eux, l'Airbus effectuait le dernier tronçon d'un vol à l'origine au départ de la France, avec escale à Sanaa, capitale du Yémen, à destination de Moroni, capitale de l'Union des Comores.

---

[1] V. Annexe 1

1

Un grand nombre de passagers à bord avait d'abord emprunté un Airbus A 330 qui assurait le vol Yemenia 749 au départ de l'aéroport Charles de Gaulle en France pour se rendre, via Marseille, à Sanaa. Puis ces mêmes passagers avaient embarqué à Sanaa, avec quelques autres nouveaux passagers à bord de l'Airbus A 310 assurant le vol IY 626 à destination de Moroni. L'avion a disparu des radars alors qu'il se trouvait en phase d'atterrissage vers l'aéroport de Moroni. Sur 153 personnes à bord, seule une jeune fille a survécu à l'accident. Parmi les victimes identifiées, on compte des ressortissants comoriens et/ou français (certains étant binationaux).

Des procédures judiciaires ont peu après été engagées en France par les ayants droit d'environ 50 victimes devant le TGI d'Aix-en-Provence situé dans la circonscription de l'aéroport de Marseille Provence, lieu de départ du vol pour un certain nombre de passagers.

Le 30 avril 2010, le TGI d'Aix-en-Provence, statuant en référé, a condamné la compagnie Yemenia à verser certaines provisions aux demandeurs. Cette ordonnance a été confirmée dans ses points essentiels par la Cour d'appel d'Aix-en-Provence le 17 février 2011.

Le 26 septembre 2011, une deuxième assignation engagée par les ayants droit de 55 victimes (parmi lesquelles les ayants droit d'au moins 24 victimes sont également demandeurs dans l'action engagée en France contre la compagnie Yemenia), complétant une assignation antérieure, a été engagée devant une juridiction de Californie (« second amended complaint »).

ILFC va déposer une « motion to dismiss » devant la même juridiction de Californie sur le fondement de la théorie du « forum non conveniens ».

**II. Présentation de l'organisation judiciaire française.**

4. Le système judiciaire français est un système de droit civil. Les juridictions de l'ordre civil sont placées sous l'autorité du Ministère de la Justice. L'on distingue les juridictions ordinaires et les juridictions spécialisées. Parmi les juridictions ordinaires, figure le Tribunal de grande instance (TGI) dont la compétence matérielle est définie par les articles L. 211-3 et s du code de l'organisation judiciaire. Le ressort du TGI est fixé par décret. Il y a, en principe, au moins un TGI par département. On en compte aujourd'hui 160 dans l'ensemble de la France. Le TGI est composé au minimum de trois magistrats, nombre nécessaire pour le jeu de la collégialité. La plupart des TGI ont un effectif supérieur.

La compétence du TGI est définie par l'article L. 211-3 du code de l'organisation judiciaire. Le TGI connaît à charge d'appel de toutes les affaires pour lesquelles la compétence n'est pas attribuée expressément à une autre juridiction, en raison de la nature de l'affaire ou du montant de la demande. Autrement dit, le TGI est une juridiction de droit commun qui a vocation à juger tout contentieux privé au-delà d'un certain seuil (10.000 euros), et notamment les actions en responsabilité qui pourraient être engagées par des particuliers contre des fabricants ou d'autres parties poursuivies en dommages-intérêts. Le TGI se prononce en première instance.

2

5. En cas d'appel, l'affaire est dévolue à la Cour d'appel qui se prononcera sur l'ensemble du dossier comme un second degré de juridiction. Il existe 35 Cours d'appel réparties sur le territoire français en fonction de ressorts de compétence territoriale.

Les décisions des Cours d'appel peuvent être déférées à la Cour de cassation qui est la juridiction suprême de l'ordre judiciaire français. La Cour de cassation se prononce uniquement en droit. Il ne s'agit donc pas d'un troisième degré de juridiction, les circonstances de fait de l'affaire n'étant alors pas examinées. La Cour de cassation a deux possibilités : soit rejeter le pourvoi ; soit en revanche censurer la décision portée à sa connaissance. Dans ce dernier cas, l'affaire est renvoyée à une autre Cour d'appel pour un nouvel examen (Cour de renvoi).

6. Dans l'ordre juridictionnel français, le TGI dispose d'une compétence exclusive pour statuer sur les demandes en réparation à l'encontre des transporteurs aériens fondées sur certaines conventions internationales, telles que la Convention pour l'unification de certaines règles relatives au transport aérien international, signée à Varsovie le 29 octobre 1929 (ci-après la « Convention de Varsovie ») ou encore la Convention pour l'unification de certaines règles relatives au transport aérien international signée à Montréal le 28 mai 1999 (ci-après la « Convention de Montréal »).

7. Toutes les juridictions françaises doivent respecter des principes fondamentaux qui sont les principes directeurs du procès qui expriment la conception française du procès civil et qui ont un caractère d'ordre public. Il s'agit de principes généraux du droit, voire de principes à caractère constitutionnel. Parmi ces principes, on citera d'abord le principe du contradictoire qui garantit un procès loyal (art. 16 du code de procédure civile, cf. CPC). Chaque partie doit être à même d'organiser sa défense. Chaque partie doit faire connaître les moyens de fait sur lesquels elle appuie ses prétentions, les moyens de preuve et de droit qu'elle invoque. De son côté, le juge doit veiller à ce que les parties respectent ce principe et doit s'y conformer lui-même. Un autre principe essentiel est le principe du dispositif : ce sont les parties qui déterminent l'objet du litige (art. 4 CPC). Le juge doit se prononcer sur tout ce qui est demandé, mais seulement sur ce qui est demandé (art. 5 CPC). Il est dans la logique de cette conception que les parties conduisent l'instance. Il faut ajouter que chaque partie doit coopérer au bon déroulement de l'instance et apporter son concours à la justice en vue de la manifestation de la vérité (art. 10 du Code civil). De son côté, le juge a une mission régulatrice : il veille au bon déroulement de l'instance (art. 3 CPC).

8. Quant au déroulement concret du procès, il faut observer que l'instance est introduite par une assignation (art. 750 CPC). Un avocat doit nécessairement représenter les parties en matière civile. La procédure devant le TGI est écrite. Chaque partie doit présenter ses prétentions par voie de conclusions, lesquelles contiennent les moyens en fait et en droit sur lesquels chacune de ces prétentions est fondée. Il faut annexer aux conclusions un bordereau récapitulatif des pièces. Les pièces qui seront utilisées doivent être communiquées à l'adversaire. En général, l'affaire est renvoyée à la mise en état pour son instruction. Une série d'audiences se déroule au cours desquelles les parties échangent leurs conclusions et pièces. Les pouvoirs du juge de la mise en état sont importants : il peut imposer des délais de procédure, demander des explications sur des points de droit ou de fait, entendre les parties, ordonner une expertise et, plus généralement, assurer le bon déroulement de la procédure. Une fois que l'affaire est en état d'être jugée et que les parties ont échangé leurs arguments, le juge prononce la clôture de l'instruction à l'issue de laquelle plus aucune conclusions ni pièce ne peuvent être déposées et fixe une date de plaidoiries. L'audience de

3

plaidoiries est en principe publique. Les débats sont oraux et dirigés par le Président du Tribunal. L'avocat du demandeur reprend ses conclusions et les développe. L'avocat du défendeur qui a toujours la parole en dernier, le fait ensuite. Les parties ne peuvent présenter au Tribunal d'arguments qui n'auraient pas été communiqués avant la date de la clôture. Le Tribunal, après avoir entendu les parties le jour de l'audience de plaidoiries, met l'affaire en délibéré. La durée moyenne d'une procédure devant le TGI, de la date d'assignation au prononcé du jugement, varie de dix mois à dix huit mois. Devant la Cour d'appel, la durée moyenne de l'instance est de l'ordre de deux ans. Elle est de deux à trois ans devant la Cour de cassation.

En toute hypothèse, la durée de la procédure doit être « raisonnable » conformément à l'article 6 de la Convention européenne de sauvegarde des droits de l'homme et des libertés fondamentales du 4 novembre 1950 dûment ratifiée par la France.

**III. Obtention de preuves et production devant les juridictions françaises.**

9. Il appartient à chaque partie de prouver les faits à l'appui de sa prétention : « il incombe à chaque partie de prouver conformément à la loi les faits nécessaires au succès de sa prétention » (art. 9 CPC). Plus concrètement, chaque partie doit produire les pièces qui viennent au soutien de sa prétention. Les pièces, par application du principe du contradictoire, doivent être communiquées spontanément, loyalement et en temps utile à la partie adverse (art. 15 et 132 CPC). A défaut, il peut être demandé au juge d'enjoindre cette communication sous astreinte (art. 133 et 134 CPC). Les pièces versées aux débats dans le cadre d'une procédure devant une juridiction française doivent être produites en français ou être accompagnées d'une traduction en langue française. Qu'elles soient détenues par les parties ou par un tiers, les pièces qui n'ont pas été communiquées aux débats peuvent faire l'objet d'une production forcée (art. 138 à 142 CPC). A cet égard, on rappellera que l'article 10 du Code civil dispose que « chacun est tenu d'apporter son concours à la manifestation de la vérité ». Si une partie ou même un tiers détient un élément de preuve, le juge saisi du litige peut lui enjoindre de le produire. Le juge peut tirer toute conséquence de l'abstention ou du refus d'une partie d'apporter son concours aux mesures d'instruction. Le juge dispose ici d'un pouvoir discrétionnaire d'appréciation et la personne qui refuserait de communiquer la pièce s'exposerait à des dommages-intérêts, voire à une injonction de communiquer sous astreinte (art. 10 Code civil ; art. 134 CPC).

10. La preuve des faits dont dépend la solution du litige peut être rapportée par tous moyens, à condition de l'être loyalement. La loyauté de la preuve est aujourd'hui un principe essentiel du droit français. La preuve peut résulter notamment de témoignages écrits ou oraux. Dans ce cadre, des témoins peuvent être entendus, en la présence des parties et de leurs conseils (art. 208 et 209 CPC). Quiconque en est légalement requis est tenu de déposer (art. 206 CPC). Les témoins défaillants et ceux qui, sans motif légitime, refusent de déposer peuvent être condamnés à une amende civile (art. 10 Code civil ; art. 207 CPC).

4

11. Plus généralement, la preuve peut être apportée par des mesures d'instruction ordonnées par le juge à la demande des parties ou d'office. La principale de ces mesures d'instruction est l'expertise judiciaire. Celle-ci est ordonnée quasi-systématiquement lorsque l'affaire est complexe et soulève des problèmes techniques, ce qui est le cas dans l'hypothèse d'un accident aérien (cf. S. Thouvenot, L'expertise judiciaire en matière aéronautique, RFDA 1977, 231).

L'expertise est destinée à éclairer le juge sur une question purement technique qui requiert des investigations complexes, étant précisé que l'expert ne saurait porter d'appréciations d'ordre juridique (art. 238 CPC). Le juge décide du recours à l'expertise et détermine la mission de l'expert (art. 263 s. CPC). L'ensemble des opérations d'expertise est placé sous le contrôle du juge qui peut même assister à ces opérations. L'expert a toute latitude dans l'exécution de sa mission, à condition de se limiter aux questions de fait qui lui sont soumises. Il est, en outre, comme le juge qui l'a nommé, tenu au respect du contradictoire. Il doit en conséquence convoquer les parties et leurs conseils aux opérations d'expertise. S'il procède à des investigations techniques hors la présence des parties, l'expert doit les leur soumettre avant le dépôt de son rapport pour leur permettre d'en débattre d'une manière contradictoire. Plus généralement, le principe du contradictoire impose à l'expert de prendre en considération les observations ou réclamations des parties. Les parties doivent remettre sans délai à l'expert tous les documents que celui-ci estime nécessaire à l'accomplissement de sa mission. Pour exécuter sa mission, l'expert peut prendre l'initiative de recueillir l'avis d'un autre technicien. Une fois les opérations d'expertise achevées, l'expert doit déposer son rapport au secrétariat du tribunal. Ce rapport doit contenir l'avis de l'expert sur chacun des points de la mission qui lui a été confiée, décrire les opérations auxquelles il a procédé et comporter en annexe les documents qui ont pu être remis à l'expert et sur lesquels il a fondé son avis, ainsi que les observations qui lui ont été adressées. Le rapport de l'expert ne saurait lier le juge ; mais il reste un élément important dans son appréciation des faits.

12. S'agissant de l'obtention de preuves aux Comores, lieu de l'accident, en l'absence de Convention bilatérale de coopération sur cette question, les précisions suivantes doivent être données.

Un juge français ne pourrait procéder par lui-même à une mesure d'instruction en dehors de son territoire national. Pour pallier cette impuissance, le juge français peut cependant déléguer ses pouvoirs au juge étranger et recourir ainsi à la technique de la commission rogatoire internationale (art. 733 s. CPC). Dans la mesure où les Comores est un Etat francophone, dans la mesure où le droit français s'est longtemps appliqué et, dans certains cas, s'applique encore, cette technique ne semble pas illusoire. Il faut en outre, compter sur l'action diplomatique en raison des liens politiques et économiques étroits existant entre la France et les Comores.

13. Il faut ajouter qu'en l'espèce, conformément aux règles internationales (Convention de Chicago du 7 décembre 1944, Annexe 13), les Comores ont ouvert une enquête de sécurité à laquelle participe le Yémen, Etat d'immatriculation et d'exploitation de l'aéronef, la France, Etat de conception et de construction de l'aéronef, et les Etats-Unis, Etat de certification originelle des moteurs d'avion.

La collecte des faits se fait dans le cadre de la commission d'enquête mise en place par les Comores. Seules les autorités chargées de l'enquête sont autorisées à communiquer sur son déroulement. La France (cf. Bureau d'Enquêtes et d'Analyses, BEA) s'est très largement impliquée dans cette enquête, ayant financé des recherches sous marines pour un montant de près de 3 Millions d'euros. Les

5

investigations conduites dans ce cadre ont permis la récupération des enregistreurs de vol et leur lecture. Selon un point d'information du 30 juin 2010 fait par le BEA, « la lecture des enregistreurs a permis de connaître les circonstances qui ont conduit à l'accident, sans toutefois en déterminer les causes, ce que seule la poursuite de l'enquête pourra faire ». Depuis, la France a demandé officiellement aux autorités comoriennes de faire le point sur les progrès de l'enquête (v. lettre du Directeur du BEA du 5 juill. 2011). Les pouvoirs publics français ont également exprimé à plusieurs reprises leurs préoccupations sur l'avancée de l'enquête (cf. déclarations du Secrétariat d'Etat aux transports).

**IV. Les actions pendantes devant les juridictions françaises**

14. Le 31 août 2009, une assignation a été délivrée en France à la société Yemenia par un certain nombre de demandeurs (52) devant le TGI de Paris en vue de dire que la responsabilité contractuelle de ladite Société Yemenia dans la mort de certaines victimes n'était pas sérieusement contestable et d'obtenir ainsi une provision sur de futurs dommages-intérêts. L'action a été introduite sur le fondement des articles 17 et 22 de la Convention de Varsovie, des dispositions du règlement européen 2027/97 du 9 octobre 1997 relatif à la responsabilité des transporteurs aériens en cas d'accident et des dispositions de l'article 809 CPC. Le 16 octobre 2009, le Président du TGI de Paris a, dans une ordonnance de référé, ordonné une procédure de médiation par application des articles 131-1 s. CPC. La compétence du TGI de Paris n'a pas été discutée, compte tenu d'une domiciliation de la compagnie Yemenia à Paris (16 avenue de l'Opéra, 75001 Paris).

15. Le 27 novembre 2009, une assignation a été délivrée en France à la société Yemenia par un certain nombre d'ayants droit (256) de certains passagers décédés (50) devant le TGI d'Aix-en-Provence en vue d'obtenir la condamnation de cette compagnie au paiement de provisions à valoir sur la réparation de leurs préjudices moral et économique.

La compétence du TGI d'Aix-en-Provence a été reconnue sur le fondement de l'art. 33 de la Convention de Montréal qui prévoit que l'action en responsabilité peut être engagée, au choix du demandeur, dans le territoire d'un des Etats Parties, soit devant le tribunal du domicile du transporteur ou du siège principal de son exploitation ou du lieu où il possède un établissement par le soin duquel le contrat a été conclu, soit devant le tribunal du lieu de destination, soit encore devant le tribunal du lieu de la résidence principale du passager et vers lequel ou à partir duquel le transporteur exploite des services de transports aériens.

La compétence du TGI d'Aix-en-Provence n'a pas été discutée pour les passagers ayant un vol aller/retour France (Marseille), via Yemen (Sanaa), les Comores (Moroni) et Yemen (Sanaa), l'aéroport français (Marseille Provence), lieu de départ du vol pour les intéressés, se situant dans le ressort du TGI d'Aix-en-Provence.

6

La compétence du TGI d'Aix-en-Provence a été discutée pour les passagers ayant un vol aller/retour France (Paris), via Yemen (Sanaa), les Comores (Moroni) et Yemen (Sanaa). Le Tribunal a cependant retenu sa compétence en observant que ces passagers avaient une résidence principale et permanente en France et qu'ils pouvaient à ce titre, alors que Yemenia exploite des services de transports aériens en France, saisir une juridiction française à leur choix.

La compétence du TGI d'Aix-en-Provence a été discutée pour quatre passagers soumis à la Convention de Varosvie et pour lesquels aucun des chefs de compétence de l'article 28 de la Convention de Varsovie n'était caractérisé.

Pour la plupart des demandeurs, l'action a été introduite sur le fondement de la Convention de Montréal, qui s'applique à tout transport dans lequel le point de départ et le point de destination se situent sur le territoire d'un seul Etat partie si une escale est prévue sur le territoire d'un autre Etat, même si cet Etat n'est pas partie à la convention. En effet, pour ces demandeurs, le vol était prévu, d'après les stipulations du contrat, de Marseille (ou Paris) à Marseille (ou Paris), avec une escale au Yemen (Sanaa), aux Comores (Moroni) et au Yemen (Sanaa). Or, la France a ratifié la Convention de Montréal, à la différence des Comores. Yemenia n'a pas contesté pour ces demandeurs l'application de la Convention de Montréal.

Pour certains demandeurs, cependant, l'action a été introduite sur le fondement de la Convention de Varsovie, qui s'applique à tout transport dans lequel le point de départ et le point de destination se situent sur le territoire de deux Etats parties. Pour ces demandeurs, en effet, le vol était des Comores aux Comores (via Sanaa) ou du Yemen aux Comores, les conditions d'application de la Convention de Varsovie étant alors remplies.

Le 30 avril 2010, le TGI d'Aix-en-Provence a, après avoir retenu sa compétence, reconnu, sur le fondement de l'article 17 de la Convention de Montréal, que le principe même de la responsabilité du transporteur n'était pas contestable, sauf pour un passager voyageant sous un faux nom. Le Tribunal a ensuite rappelé, conformément au droit français, tant le préjudice moral que le préjudice économique pouvaient être indemnisés dans la mesure où ils étaient certains et directs. Le Tribunal a également considéré qu'une provision *ad litem* (de 1.000 euros) devait être accordée à chaque demandeur et qu'une somme de 600 euros devait être accordée au titre des frais irrépétibles (art. 700 CPC). Le Tribunal a, enfin, après avoir apprécié la situation respective de chacun des demandeurs, alloué des provisions, sur l'indemnisation des préjudices d'ordre moral et économique, d'un montant variable selon les demandeurs.

Le TGI d'Aix-en-Provence a procédé à la même analyse sur le fondement de l'article 17 de la Convention de Varsovie, pour le passager concerné, en relevant que les ayants droit de ce passager ne pouvaient en référé obtenir un dépassement du plafond de garantie édicté par la Convention de Varsovie.

16. Le 17 février 2011, la Cour d'appel d'Aix-en-Provence a, pour la plupart des demandeurs, confirmé la décision de première instance. La Cour, après avoir rappelé les dispositions des articles 17 et 21 de la Convention de Montréal, a fait observer qu'il n'était pas discutable que la charge de la preuve de faits exonératoires de responsabilité incombait à Yemenia pour les dommages excédant 100.000 DTS par passager, dès lors que les causes de l'accident n'étaient toujours pas connues, et qu'il y avait lieu de retenir qu'en application de l'article 809 CPC l'obligation du transporteur n'était

7

pas sérieusement contestable à hauteur de la contre valeur en euros de 100.000 DTS par passager. La Cour a également condamné Yemenia à payer à l'ensemble des ayants droit de chaque victime 4.000 euros au titre de la provision *ad litem* et 2.000 euros pour frais irrépétibles exposés en première instance et en appel.

La Cour a examiné par ailleurs certains cas particuliers (demande pour un passager non identifié ; évaluation concrète du préjudice moral et/ou économique pour certaines victimes).

17. Outre les actions visées aux paragraphes 14 à 16 ci-avant, ayant abouti à des décisions que j'ai pu examiner, les ayants droit d'autres passagers ont agi, dans des termes similaires, en référé et au fond contre Yemenia devant les TGI d'Aix-en-Provence, de Paris et de Marseille. Ces actions ont donné lieu à une douzaine de décisions en référé.

18. Par ailleurs, en juillet 2009, une instruction pénale été ouverte en France devant le TGI de Bobigny en vue de déterminer les causes de l'accident. Deux juges français sont en charge de l'enquête pénale et ont nommé plusieurs experts qui ont rendu un premier rapport d'étape au cours du premier trimestre 2011, rapport qui n'est cependant pas public.

On remarquera que la mise en œuvre d'une procédure pénale présente un certain nombre d'intérêts pour les parties concernées. La constitution de partie civile permet en effet aux victimes ou à leurs proches d'obtenir du juge d'instruction, assisté d'experts, des éléments de preuve facilitant la démonstration de toute éventuelle faute. En participant à l'instruction, les parties civiles auront accès aux rapports et conclusions des experts figurant au dossier pénal. Les parties civiles ne sont pas tenues au secret de l'instruction. On ajoutera que, conformément aux articles R 155 et s. du code de procédure pénale, il peut être demandé au Procureur de la République l'autorisation de délivrer des copies de pièces d'un dossier pénal pour les besoins d'un procès civil.

## V. Compétence internationale des juridictions françaises

19. Dans l'hypothèse où le défendeur (ILFC) était assigné devant une juridiction française dont il ne contesterait pas la compétence, la juridiction saisie ne pourrait elle-même relever d'office son incompétence. En effet, les articles 92 et 93 CPC n'offrent, sous certaines conditions, à la juridiction saisie la possibilité de se déclarer incompétente d'office que dans l'hypothèse où une loi attribuerait compétence exclusive à une autre juridiction pour connaître du litige. Un exemple d'une telle compétence exclusive serait le cas d'une convention internationale donnant compétence exclusive à une juridiction déterminée pour connaître d'un litige : ainsi en est-il des actions dirigées contre le transporteur aérien sous le régime de la Convention de Varsovie ou de la Convention de Montréal qui donne une compétence exclusive pour de telles actions.

Il faut préciser que la Cour de cassation a clairement décidé qu'un Tribunal français ne pouvait soulever d'office son incompétence seulement en présence d'une règle de compétence d'ordre public, c'est-à-dire en matière internationale, seulement lorsqu'une juridiction étrangère a une compétence exclusive (Cass. 1$^{ère}$ civ. 16 déc. 1986, Bull. civ. I, n° 300). A ma connaissance il n'existe aucun précédent dans la jurisprudence française dans lequel une juridiction se serait déclarée

8

d'office territorialement incompétente en présence d'un consentement exprès des défendeurs à la compétence des juridictions françaises et en l'absence de compétence exclusive d'une juridiction étrangère.

On peut ajouter que l'article 24 du règlement européen 44/2001 concernant la compétence judiciaire et l'exécution des décisions de justice en matière civile et commerciale prévoit qu' « outre les cas où sa compétence résulte d'autres dispositions du présent règlement, le juge d'un Etat membre devant lequel le défendeur comparaît est compétent ». En d'autres termes, l'article 24 du règlement autorise la prorogation de compétence du juge de l'Etat membre devant lequel comparaît volontairement le défendeur, sauf si cette comparution a pour but de contester la compétence du juge saisi ou s'il existe une autre juridiction exclusivement compétente (v. du reste en un sens très favorable à la prorogation de compétence, CJUE 20 mai 2010, aff. C-111/09, Rev. crit. DIP 2010, 575, note Pataut, décidant que la violation des règles de compétence spéciale protectrices d'une partie faible ne permet pas de faire obstacle à la prorogation volontaire de compétence). On peut même se demander, dans la mesure où le règlement n'a posé aucune condition relative au domicile des parties, si la prorogation de compétence du juge saisi n'est pas admise même en l'absence de tout rattachement de l'affaire à l'Union Européenne (v. H. Gaudemet-Tallon, Compétence et exécution des jugements en Europe, n° 164).

En tout cas, aucune règle d'ordre public ne donne compétence exclusive aux tribunaux américains pour connaître des actions à l'encontre du défendeur résultant de l'accident du vol Yemenia au large des Comores. En conséquence, je considère que si les demandeurs portaient leurs actions en France, la juridiction saisie ne pourrait pas décliner d'office sa compétence pour connaître de ces actions. Ce serait certainement le cas si le défendeur comparaissait sans contester cette compétence. L'absence de contestation de la compétence de la juridiction française peut être implicite et résulter de la simple participation à l'instance. Elle peut être également expresse et résulter d'une manifestation de volonté claire et précise, de la part du défendeur. Au cas d'espèce, je comprends que dans l'hypothèse où l'action aux Etats-Unis était écartée et où une instance était de ce fait engagée devant une juridiction française, le défendeur consentirait à la compétence d'une telle juridiction. Dans une telle situation, le Tribunal de première instance saisi ne pourrait pas décliner sa compétence. Ce serait le cas aussi bien si les demandeurs à l'action étaient de nationalité française que de nationalité étrangère.

20. En toute hypothèse, si l'on tient compte des circonstances de l'espèce, la compétence d'une juridiction française peut être retenue en application de l'un des critères suivants :

i) en matière délictuelle, la compétence internationale d'un Tribunal se détermine sur le fondement de l'article 46 CPC aux termes duquel le demandeur peut saisir, à son choix, outre la juridiction du lieu où demeure le débiteur, la juridiction du lieu du fait dommageable ou celle dans le ressort de laquelle le dommage a été subi. Il est permis de penser que lorsque l'action est engagée par des parents ou des proches de la victime et que ces derniers demandent la réparation de leur préjudice personnel, le dommage est en réalité subi au lieu de leur domicile et non pas au lieu de sa réalisation. Néanmoins, en droit interne, une décision de la Cour de cassation s'est prononcée en sens contraire (Cass. 2ème civ. 11 janv. 1984, Bull. civ. II, n° 4). Il reste que l'autonomie de la réparation du préjudice par ricochet par rapport à la réparation du préjudice des victimes directes est une solution défendue par de nombreux auteurs, tant en droit interne (v. G. Viney, l'autonomie

9

du droit à la réparation de la victime initiale, D. 1974, Chron. 3 ; égal. G. Viney et P. Jourdain, Traité de droit civil, Les conditions de la responsabilité civile, 3ème éd., LGDJ, n° 321), qu'en doit international. En droit international précisément, une thèse remarquée soutient que la réparation du préjudice par ricochet, compte tenu de sa spécificité, doit obéir non pas à la loi du lieu où le dommage s'est réalisé, mais à la loi du lieu où la réparation de ce préjudice doit être assurée (O. Boskovic, La réparation du préjudice en droit international privé, LGDJ 2003, préf. P. Lagarde, n° 320).

ii) En outre, la compétence d'une juridiction française peut se fonder sur les dispositions de l'article 42, al. 2, CPC. Ce texte renvoie à l'hypothèse d'une pluralité de défendeurs, ce qui correspond au cas d'espèce. En effet, les victimes agissent tant à l'encontre du transporteur aérien qu'à l'encontre du propriétaire loueur de l'appareil. Et, il est possible, ce qui, à ce jour, n'est pas encore fait, qu'ils agissent également contre le constructeur et contre les équipementiers.

S'agissant de l'action contre le transporteur aérien, la compétence du Tribunal français n'est pas contestable (v. supra, n° 15). Or, l'article 42, al. 2, prévoit que lorsqu'il y a plusieurs défendeurs, le demandeur peut saisir, à son choix, la juridiction du lieu où demeure l'un d'eux. En application de cette disposition, transposable dans le domaine international (Cass. 1ère civ. 4 mai 1976, Bull. civ. I, n° 152 ; Cass. com. 13 avr. 2010, Bull. civ. IV, n° 77), dans la mesure où les diverses demandes dirigées contre des défendeurs différents entretiennent entre elles un lien étroit de connexité, il faut considérer que lorsqu'un Tribunal est territorialement compétent à l'égard de l'un des défendeurs, il l'est également à l'égard des autres. Le fait que le transporteur aérien ne soit pas à proprement parler domicilié sur le territoire français, mais ait simplement un établissement en France ne devrait rien changer à l'affaire. En effet, la jurisprudence laisse clairement entendre (cf. Cass. com. 20 juill. 1981, Bull. civ. IV, n° 324) que le demandeur peut attraire un codéfendeur devant une juridiction dont la compétence a un fondement « territorial », ce qui est un critère plus large que le seul domicile.

Il est vrai que la jurisprudence française décide aujourd'hui que le texte de l'article 28 de la Convention de Varsovie, en exigeant de manière exclusive que l'action contre le transporteur aérien soit portée devant certains tribunaux, écarte nécessairement qu'une autre juridiction puisse être saisie (Cass. com. 12 nov. 2009, n° 08-15.269 ; égal. Cass. 1ère civ. 11 juill. 2006, Bull. civ. I, n° 379). Dans ces conditions, si les victimes d'un accident de transport aérien décident de porter leur action devant le Tribunal du siège social du constructeur ou du propriétaire-loueur de l'appareil, le Tribunal saisi de cette action n'a pas compétence pour se prononcer sur l'action engagée, antérieurement ou postérieurement, contre le transporteur, dans la mesure où le Tribunal saisi de l'action contre le constructeur n'est pas compétent, sur le fondement de l'article 28 de la Convention de Varsovie ou de l'article 33 de la Convention de Montréal pour se prononcer contre le transporteur. En effet, il n'existe ni dans la Convention de Varsovie ni dans la Convention de Montréal de disposition expresse selon laquelle la juridiction compétente pour statuer sur la demande dirigée contre le constructeur ou le propriétaire-loueur de l'appareil peut l'être également pour se prononcer sur une demande connexe dirigée contre un transporteur aérien.

MARA SCAGLIONE
Expert
Traducteur-Interprète
Cour d'Appel de Paris
Italien-Anglais-Français
Tél. 01 69 31 42 02
8, ch. du Clotinet - 91140 Villejust

10

Cependant, la juridiction française compétente pour se prononcer sur la demande dirigée contre le transporteur aérien peut également, en application de l'article 42, al. 2, CPC, être compétente pour se prononcer sur des demandes connexes dirigées contre le propriétaire-loueur et les fabricants de l'appareil. Une fois encore, la connexité est dans l'ordre international, un chef de compétence des juridictions françaises.

21. On ajoutera que dans l'hypothèse où les demandeurs engageaient une action contre le propriétaire de l'appareil (ou contre le constructeur et l'équipementier) devant une juridiction française autre que le TGI déjà saisi de l'action contre le transporteur, cette juridiction française devrait se dessaisir et renvoyer en l'état la connaissance de l'affaire au TGI saisi en application de l'article 101 CPC. Ce texte dispose en effet que : « s'il existe entre des affaires portées devant deux juridictions distinctes un lien tel qu'il soit de l'intérêt d'une bonne justice de les faire instruire et juger ensemble, il peut être demandé à l'une de ces juridictions de se dessaisir et de renvoyer en l'état la connaissance de l'affaire à l'autre juridiction ».

**VI. Aspects de droit matériel français**

22. En droit français, les victimes de préjudices subis du fait d'un loueur d'avion ou encore d'un fabricant ou d'un équipementier pourraient engager une action en réparation sur le fondement de diverses dispositions.

23. Une action pourrait être fondée sur l'article 1382 du Code civil. Les demandeurs devraient alors prouver la faute du défendeur, leur préjudice et le lien de causalité entre la faute et le préjudice. La faute est caractérisée en cas de manquement à une obligation préexistante : inobservation d'une règle de sécurité, non respect d'une disposition légale ou réglementaire ou plus généralement manquement à un devoir de prudence ou de diligence. La faute peut consister aussi bien en un acte positif qu'en une abstention. Il appartient en tout cas au demandeur d'en apporter la preuve. Les juges du fond sont souverains pour constater les faits d'où ils déduisent l'existence d'une faute, mais ils doivent en toute hypothèse qualifier cette faute de manière que la Cour de cassation puisse exercer son contrôle (Cass. 2$^{ème}$ civ. 24 nov. 1955, D. 1956, 163).

24. Une action pourrait être également fondée sur l'article 1384, al. 1, du Code civil. Les demandeurs doivent alors établir que la chose sous la garde d'une personne a été l'instrument d'un dommage. Le gardien de cette chose assume alors une responsabilité de plein droit. L'application de l'article 1384, al. 1, du code civil implique nécessairement que le demandeur apporte la preuve que la chose a joué un rôle causal dans la réalisation du dommage. On précisera qu'une chose inerte ne peut être considérée comme ayant été l'instrument du dommage, si la preuve n'est pas rapportée qu'elle occupait une position anormale ou qu'elle était en mauvais état.

Quant à la garde de la chose, elle est caractérisée par les pouvoirs de surveillance et de contrôle exercés sur ladite chose. Le droit français fait une distinction entre la garde de la structure et la garde du comportement. Ainsi peut-on, par exemple, considérer que le fabricant d'une bouteille (remplie d'une boisson gazeuse) ayant explosé pour une raison inconnue, endosse la responsabilité des dommages causés en tant que gardien de la structure de la chose. Autrement dit, le fabricant est

11

supposé avoir conservé la garde de la chose malgré les ventes successives dont elle a pu être l'objet. En revanche, si le dommage est lié au comportement même de la chose, la responsabilité ne peut être assumée que par celui qui en a la maîtrise en tant que gardien de son comportement.

25. S'agissant de l'indemnisation des victimes, on observera que le droit français retient, quant aux caractères requis du préjudice qui doit être établi par le demandeur, les quatre critères suivants : caractère personnel, direct, certain et licite.

En particulier, compte tenu du caractère personnel du préjudice, les ayants droit peuvent d'abord engager une action dite successorale en réparation du préjudice subi par leur auteur décédé. Ils peuvent ensuite engager une action personnelle pour obtenir la réparation de leurs propres préjudices induits par le décès. On parle de préjudice par ricochet, ce qui renvoie aussi bien à un préjudice économique, du fait de la perte du soutien de famille, qu'à un préjudice moral.

Parmi les préjudices économiques et patrimoniaux, les ayants droit pourront obtenir la réparation des pertes financières subies. Ils pourront également obtenir la réparation des gains manqués (pertes de ressources consécutives à l'accident ; pertes des ressources professionnelles de la victime décédée). A cet égard, les juges du fond ont un pouvoir d'appréciation *in concreto*. La perte des ressources professionnelles de l'ayant droit lui-même est susceptible d'être réparée : tel est le cas en cas d'accident brutal qui peut être à l'origine d'une dépression.

En outre, la jurisprudence admet depuis longtemps la réparation du préjudice moral des proches de la victime décédée dans un accident (Cass. civ. 13 févr. 1923, D.P. 1923, 1, 52). Ainsi, le trouble, tel que la peine résultant de la disparition d'un être cher, est susceptible d'être réparé. Il appartient aux juges du fond d'évaluer ce préjudice et de le faire en tenant compte de toutes les circonstances de la cause (Cass. 2ème civ. 28 nov. 1962, D. 1963, 77).

26. Les actions en responsabilité délictuelle se prescrivent dans les conditions du droit commun. A cet égard, l'article 2224 du code civil dispose d'une manière générale que les actions personnelles se prescrivent par cinq ans à compter du jour où le titulaire d'un droit a connu ou aurait dû connaître les faits lui permettant de l'exercer.

L'article 2226 du Code civil précise que l'action en responsabilité née à raison d'un événement ayant entraîné un dommage corporel, engagée par la victime directe ou indirecte des préjudices qui en résultent, se prescrit par dix ans à compter de la date de la consolidation du dommage initial ou aggravé.

On ajoutera que rien ne s'oppose à ce que ce délai soit prolongé volontairement par les parties (art. 2254 C. civ.). Rien ne s'oppose également à ce que le défendeur lui-même renonce au bénéfice de la prescription, du moins lorsque celle-ci est acquise (art. 2250 C. civ.). De même, les parties pourraient parfaitement décider de suspendre d'un commun accord le délai de prescription (art. 2254, al. 2 et 2234 C. civ.).

MARA SCAGLIONE
Expert
Traducteur-Interprète
Cour d'Appel de Paris
Italien-Anglais-Français
Tél. 01 69 31 42 02
8, ch. du Clotinet - 91140 Villejust

12

**Conclusion**

27. En France, le TGI est la juridiction de première instance de droit commun pour les actions en responsabilité engagées par les particuliers. La compétence des juridictions françaises pour connaître des actions engagées par les demandeurs aux Etats-Unis contre ILFC au titre de l'accident du vol Yemenia repose sur de multiples fondements.

ILFC peut décider de se soumettre à la compétence des juridictions françaises, soit de manière expresse, soit de manière implicite. Si ILFC consentait à la compétence d'un TGI en France, ce TGI n'aurait pas le pouvoir de décliner d'office sa compétence, dès lors qu'une juridiction étrangère n'a pas de compétence exclusive pour connaître des actions dirigées contre ILFC (art. 92 CPC ; l'article 24 du règlement européen 44/2001 fonde aussi cette solution). Ce serait le cas, que les demandeurs soient de nationalité française ou étrangère.

Les actions peuvent également être engagées devant la juridiction dans le ressort de laquelle les demandeurs ont subi leur préjudice (art. 46 CPC). Il n'est pas interdit de considérer, même si la jurisprudence française n'est pas favorable à cette opinion, que les demandeurs français ont subi leur préjudice au lieu de leur résidence en France, ce qui permettrait à ces demandeurs français d'engager leur action en France.

De même une compétence française pourrait être retenue sur le fondement de l'article 42, al. 2, CPC dans la mesure où une demande formée contre ILFC entretient un lien de connexité avec une demande introduite contre le transporteur, étant précisé qu'en l'espèce la compétence d'un Tribunal français n'est pas contestable s'agissant de l'action engagée contre le transporteur.

28. Ainsi, la compétence d'une juridiction française pour connaître d'une action en indemnisation engagée par les demandeurs à l'encontre de ILFC repose-t-elle sur des fondements différents et n'est-elle pas contestable. De plus, cette juridiction ne pourrait décliner sa compétence si ILFC acceptait de se soumettre, expressément ou implicitement, à la compétence de la juridiction française.

29. Les demandeurs pourraient obtenir la jonction de l'instance engagée contre ILFC avec la procédure actuellement pendante devant le TGI d'Aix-en-Provence à l'encontre de la compagnie Yemenia. S'ils venaient à engager une action contre ILFC devant un autre TGI, cette action serait vraisemblablement renvoyée devant le TGI d'Aix-en-Provence en application de l'article 101 CPC.

30. En droit français, les demandes de réparation dirigées contre un loueur d'aéronefs ou encore contre un fabricant ou un équipementier peuvent être présentées en application des articles 1382 et 1384, al. 1, du Code civil sur le fondement de la responsabilité pour faute ou de la responsabilité pour fait des choses. Les demandeurs peuvent présenter une action en indemnisation du préjudice subi par leurs auteurs décédés et de leur préjudice personnel sur le plan patrimonial et extra patrimonial.

MARA SCAGLIONE
Expert
Traducteur-Interprète
Cour d'Appel de Paris
Italien-Anglais-Français
Tél. 01 69 31 42 02
co.ch. du Cloitnet - 91140 Villejust

13

31. Les principes fondamentaux de la procédure civile française permettraient en l'espèce d'assurer le caractère loyal, contradictoire et exhaustif du débat judiciaire. Compte tenu notamment du principe du double degré de juridiction et de la possibilité d'un recours en cassation, les parties ont très largement la possibilité de faire valoir leurs arguments de droit et de fait et de soumettre leurs moyens de preuve au juge et aux autres parties. La preuve est administrée devant le juge français soit par oral, soit par écrit. Le juge dispose de moyens procéduraux permettant d'enjoindre aux parties ou à des tiers de produire des pièces en leur possession, sous peine d'astreinte et d'amende civile. Le juge français a également la possibilité de désigner un expert pour l'éclairer sur toute question technique dont peut dépendre la solution du litige (que la question soit purement technique, médicale ou économique s'agissant de l'évaluation du préjudice).

32. De plus une action en France permettrait à une seule et unique juridiction d'examiner les actions dirigées contre l'ensemble des parties potentiellement responsables et de se prononcer sur toutes les questions relatives aux responsabilités encourues à la suite de l'accident de la Yemenia. En particulier, plusieurs centaines de demandeurs ont déjà engagé une action devant le TGI d'Aix-en-Provence en vue d'obtenir une réparation pleine et entière de la part de la compagnie Yemenia des préjudices résultant du décès des passagers dans la catastrophe aérienne.

 Au demeurant, ces demandeurs ont déjà obtenu des provisions à valoir sur la réparation définitive. Il est certain que la responsabilité de la compagnie aérienne, tant sur le fondement de la Convention de Montréal que sur celui de la Convention de Varsovie, est au cœur de l'instance civile française.

33. En outre, une instruction pénale aux fins de déterminer les causes de l'accident, ainsi que les éventuelles responsabilités pénales, est pendante devant le TGI de Bobigny. Le juge d'instruction dispose des pouvoirs les plus étendus pour rassembler les preuves utiles à son enquête. Ces éléments de preuve pourront être utilisés dans le cadre de l'instance civile française.

34. Enfin, il faut observer que les Comores font partie de la communauté francophone, que le français est, en application de l'article 1 de la Constitution des Comores, une langue officielle, et que les Comores font partie de l'OHADA (Organisation de l'Harmonisation du droit des affaires en Afrique).

Il faut ajouter que la communauté comorienne est très présente en France, notamment dans le Midi et à Marseille. Malgré l'indépendance de la République des Comores proclamée en 1975, des liens très étroits demeurent avec la France, compte tenu d'une langue commune, le français, d'échanges économiques et politiques importants et de la proximité de l'Ile de Mayotte qui fait partie de l'archipel des Comores, mais qui est restée française et qui, aujourd'hui, a le statut de département français.

MARA SCAGLIONE
Expert
Traducteur-Interprète
Cour d'Appel de Paris
Italien-Anglais-Français
Tél. 01 69 31 42 02
8, ch. du Cloûnet - 91140 Villejust

14

35. Au terme de ces développements, je considère donc que l'ordre juridictionnel français offre aux demandeurs un forum accessible et approprié pour connaître de leur action à l'encontre de la société ILFC.

36. Je déclare, sous peine de parjure conformément aux lois des Etats Unis d'Amérique, que cette attestation est exacte et sincère.

Fait à Paris, le 3 février 2012

Philippe Delebecque

ANNEXE 1

Curriculum Vitae



Nom :                DELEBECQUE
Prénom :             Philippe
Né le :              18 mai 1954 (La Roque s. Pernes, Vaucluse)
Nationalité :        Française
Statut marital :     Marié ; deux enfants
Adresse :            4, rue de la Paix – 75002 Paris
Tél. :               01.42.60.35.60 – 01.42.60.35.76 – 06.11.88.37.57
E-mail :             ph.delebecque@wanadoo.fr

Professeur à l'Université de Paris-I (Panthéon-Sorbonne)

Docteur d'Etat en droit : « Les clauses allégeant les obligations dans les contrats », thèse Aix-Marseille, 1981, sous la direction de Pierre Bonassies
Agrégé des facultés de droit (droit privé – sciences criminelles), 1982

Professeur à l'Université de La Réunion (1983-1986),
  Doyen de la faculté de droit et des sciences économiques

Professeur à l'Université d'Aix-Marseille III (1986 – 1992),
  Directeur de l'Institut d'Etudes Judiciaires
  Directeur du DESS Droit du commerce extérieur

Professeur à l'Université de Paris-I (depuis octobre 1992).
  Directeur du Master Recherche, Droit du patrimoine privé

Membre du Conseil National des Barreaux (1997-2000)
Membre du Conseil National des Universités (2000-2003)
Membre du jury d'agrégation de droit privé (concours 2003 ; concours 2008)
Membre du jury de l'ENA (1986 – 1989)
Membre du jury d'agrégation (CAMES – Afrique) (1987, 1989, 1991, 1993)

Principales matières enseignées :
 droit civil ; droit maritime, droit aérien et des transports ; droit du commerce international

Principales publications :
 Cours de droit civil (1. Le contrat – 2. La responsabilité – 3. Régime des obligations), Litec ;
 Droit civil, Les sûretés (précis Dalloz), en collaboration avec Ph. Simler ;
 Droit civil, Contrats civils et commerciaux (précis Dalloz), en collaboration avec F. Collart ;
 Droit maritime, précis Dalloz (pour 2012) ;
 Droit du commerce international (précis Dalloz 2010), en collaboration avec JM Jacquet ;
 Droit commercial, Traité de Ripert et Roblot, t. 2 (en collaboration avec M. Germain) ;
 Traité de droit des transports, LGDJ (en préparation).

Collaborateur du Droit maritime français (DMF)
                    de la Revue trimestrielle de droit commercial (droit du commerce international)
                    de la Revue des contrats (chronique contrats spéciaux)
                    de la Semaine Juridique (chronique Droit des sûretés, avec M. Simler)
                    de la Revue de droit des transports

16

Collaborations au Juris-Classeur civil et au Répertoire Dalloz (droit civil et commercial)
Directeur du Juris-Classeur Transports
Co-Directeur scientifique de la Revue de droit des transports

Missions d'enseignement : Universités de Tananarive, Mauritius, Yaoundé, Dakar, Douala, Le Caire,
Tunis, Oran, Tlemcen, Casablanca, Thessalonique, Milan, Bologne, Sarrebrück, Porto-Alegre, Bogota,
Montréal, Chuo, Shangaï ; IDLI Rome ; Académie de droit international de La Haye

Membre de l'Académie de Marine
Président de la Chambre Arbitrale Maritime de Paris
Président de la Société Française de Droit Aérien et Spatial
Vice Président de l'Association Française du Droit Maritime
Administrateur de l'Institut Méditerranéen des Transports Maritimes

Expert auprès de la Banque Mondiale
Expert auprès de l'Organisation Maritime Internationale
Expert auprès du Conseil National des Transports
Expert auprès du Ministère des Affaires Etrangères (CNUDCI – Droit des Transports)
Arbitre (Chambre arbitrale maritime de Paris ; Chambre arbitrale internationale de Paris ; CCI ; AFA)
Ex-Membre du Conseil des Gouverneurs de l'Université Maritime Mondiale (Malmoë)

Conseiller municipal de La Roque sur Pernes (Vaucluse)



EXHIBIT A, PAGE 000042

ATTESTATION OF PROFESSOR DELEBECQUE IN SUPPORT OF A MOTION TO DISMISS

ON THE BASIS OF THE THEORY OF *FORUM NON CONVENIENS*

1. I, the undersigned, Philippe Delebecque, Professor at the University of Paris-I (Pantheon-Sorbonne)[1], was consulted by counsel for International Lease Finance Corporation (hereinafter ILFC) which was summoned by certain alleged surviving beneficiaries of the victims of the crash of the Yemenia IY 626 flight. I was requested to prepare an attestation in support of ILFC's motion to dismiss based on the theory of *forum non conveniens.*

2. Following examination of the documents submitted to me, that is:

- an interlocutory order from the District Court [*Tribunal de Grande Instance*] of Paris dated Oct. 16, 2009;

- an interlocutory order from the District Court of Aix-en-Provence dated April 30, 2010;

- an interlocutory order from the District Court of Paris dated September 8, 2010;

- an interlocutory order from the District Court of Paris dated October 6, 2010;

- a decision of the Court of Appeals [*Cour d'appel*] of Aix-en-Provence dated February 17, 2011;

- an interlocutory order from the District Court of Paris dated June 8, 2011;

- an interlocutory order from the District Court of Aix-en-Provence dated July 12, 2011;

- the second amended complaint filed with the District Court of California by certain surviving beneficiaries of the victims,

I am able to make the following attestation, furthermore stating that I am prepared to serve as a witness if so requested.

**I. Facts.**

3. On June 30, 2009, an Airbus A 310 operated by the Yemenia company and owned by ILFC crashed into the sea off the Comoros coast with 142 passengers on board and 11 crew members. For most of

---

[1]        See Annex 1



MARA SCAGLIO
Expert
Traducteur-Interprète
Cour d'Appel de Paris
Italien-Anglais-Français
Tél. 01 69 31 42 02
8, ch. du Clotinet - 91140 Villejust

1

them, the Airbus was flying the last leg of a flight that had originally left France, connecting in Sanaa, the capital of Yemen and continuing on to Moroni, the capital of the Union of Comoros.

A large number of passengers on board had taken an Airbus 330 which ensured the Yemenia 749 flight departing from the Charles de Gaulle airport in France to go to Sanaa via Marseille. These same passengers then boarded the Airbus A 310 at Saana, with several other new passengers, which aircraft ensured the IY 626 flight to Moroni. The aircraft disappeared from the radar screen during the landing phase at the Moroni airport.  Only one young girl survived the accident out of the 153 individuals on board. Comorian and/or French citizens (certain being dual nationals) were amongst the identified victims.

Shortly thereafter court proceedings were instituted in France by the surviving beneficiaries of approximately 50 victims, before the District Court of Aix-en-Provence; this court is located in the circumscription of the Marseille Provence airport, from which a certain number of passengers took off.

On April 30, 2010, the District Court of Aix-en-Provence, ruling in summary proceedings, ordered Yemenia to make certain interim payments to the plaintiffs. On February 17, 2011 the Court of Appeals of Aix-en-Provence upheld the key points of such order.

On September 26, 2011, a second amended complaint by the surviving beneficiaries of 55 victims (amongst which surviving beneficiaries of at least 24 victims are also plaintiffs in the action against Yemenia in France) amending a prior complaint, was then filed with a California court.

ILFC shall file a motion to dismiss with the same California court based on the theory of *forum non conveniens*.

**II. The French court system.**

4. The French court system is a civil law system. Civil courts are placed under the authority of the Ministry of Justice. A distinction should be made between ordinary and specialized courts. District Courts (DC) form part of the ordinary courts. The subject matter jurisdiction of such courts is defined by Articles L. 211-3 *et seq.* of the Code of Judicial Organization. Competence of District Courts is set by decree. In principle, there is at least one District Court per department. As of today, there are 160 District Courts in all of France. A District Court is comprised of at least three judges, which number is necessary for it to function as a collegiate body. Most District Courts have a greater number of judges.

The jurisdiction of District Courts is defined by Article L. 211-3 of the Code of Judicial Organization. Subject to appeal, District Courts rule on all matters for which jurisdiction has not been expressly conferred on another court due to its nature or the amount of the claim. In other words, a District Court is a common law court having the power to judge all private litigation in excess of a certain threshold (10,000 euros), *inter alias* liability suits that might be brought against manufacturers or other parties being sued for damages. District Courts are courts of first instance.

2

5. In case of an appeal, the matter is brought before a Court of Appeals. Such court rules on the whole of the case as a court of second instance. There are 35 Courts of Appeal spread over the French territory according to territorial jurisdiction.

Decisions of the Courts of Appeal may be lodged with the Court of Cassation [*Cour de cassation*], the supreme court in the French judicial system. The Court of Cassation rules only on issues of law. It is therefore not a court of third instance as the factual circumstances of the matter are not examined. The Court of Cassation has two possibilities: it may either dismiss the appeal or quash the decision referred to it. In the latter case, the case is remanded to another Court of Appeals in order to be reexamined (court of remand).

6. A District Court has exclusive jurisdiction within the French judicial system to rule on claims for compensation against air carriers based on certain international conventions, such as the Convention for the Unification of Certain Rules Relating to International Carriage by Air, Signed at Warsaw on October 29, 1929 (hereinafter the "Warsaw Convention") or the Convention for the Unification of Certain Rules Relating to International Carriage by Air, Signed at Montreal on May 28, 1999 (hereinafter the "Montreal Convention").

7. All French courts must observe the fundamental principles which are the guiding principles of the proceeding, expressing the French concept of a civil proceeding and which are public policy. These are general principles of law, or even principles which are constitutional in nature. Amongst such principles there must first be cited the adversarial principle which guarantees a fair proceeding (Article 16 of the Code of Civil Procedure, cf. CCP). Each party must be able to organize his defense. Each party must disclose the facts on which he is basing his claims, and the means of proof and law he is raising. The judge in turn must ensure that the parties observe this principle and he himself must comply with it. Another fundamental principle is that according to which the parties have the initiative of the proceeding: it is the parties who determine the subject matter of the dispute (Art. 4 of the CCP). The judge must rule on all that is claimed but only what is claimed (Art. 5 of the CCP). It is in keeping with the logic of this concept that the parties conduct the proceeding. It should be added that each party must cooperate in the proper progress of a proceeding and assist the court in ascertaining the truth (Article 10 of the Civil Code). The judge in turn has a supervisory mission: he ensures the proper progress of the proceeding (Article 3 of the CCP).

8. With respect to the actual conduct of the proceeding, it must be noted that a proceeding is instituted by a summons (Art. 750 of the CCP). An attorney must represent the parties in civil matters. The proceeding before a District Court is written. Each party must make his claims in the form of a brief containing the factual and legal arguments on which each claim is based. A statement summarizing his exhibits is attached to the brief. The exhibits relied on must be transmitted to the adverse party. As a general rule, the matter is submitted to a pretrial procedural examination. A series of status conferences are held during which the parties exchange their briefs and exhibits. The powers of the pretrial procedural judge are considerable: he may impose procedural time limits, request explanations regarding points of law and fact, hear the parties, order an expert proceeding and, more generally, ensure the proper progress of the proceeding. Once the matter is ready to be judged and the parties have exchanged their arguments, the judge pronounces the closing of the examination phase following which no other briefs or exhibits may be filed and a date for oral arguments is set. In principle the hearing is open to the public. Arguments are oral and directed by

3

the Presiding Judge of the court. Plaintiff's counsel reiterates and expounds on his written pleadings. Counsel for the defendant, who always has the last word, does so thereafter. Parties may make no arguments to the court which were not transmitted before the date of closing. After hearing the parties' pleadings, the court sets the matter for judgment. The average length of proceedings before a District Court, between the date of summons and the date of judgment, varies between ten and eighteen months. The average length of proceedings before a Court of Appeals is approximately two years; it is two to three years before the Court of Cassation.

In any event, in accordance with Article 6 of the European Convention for the Protection of Human Rights and Fundamental Freedoms, duly ratified by France on November 4, 1950, the length of the proceeding must be «reasonable».

**III. Obtaining evidence and production before French courts.**

9. It is up to each party to prove the facts in support of his claim: «it shall be incumbent upon each party to prove, in accordance with law, the facts necessary for the success of his claim» (Art. 9 of the CCP). More concretely, each party must produce exhibits in support of his claim. Pursuant to the principle of adversarial proceedings, the exhibits must be disclosed spontaneously, fairly and in a timely manner to the adverse party (Art. 15 and 132 of the CCP). Failing which, the judge may be requested to enjoin such communication under penalty of payment (Art. 133 and 134 of the CCP). Exhibits introduced into evidence in connection with a proceeding before a French court must be produced in French or be accompanied by a French translation. Whether they are held by the parties or a third party, any documents which have not been communicated into evidence may be subject to forced production (Art. 138 to 142 of the CCP). In this regard, it must be recalled that Article 10 of the Civil Code provides that «everyone is bound to collaborate with the court in ascertaining the truth.» If a party or even a third party is in possession of an element of proof, the judge to which the matter is referred may order him to produce it. The judge may draw all conclusions from the failure or refusal of such party to lend his support in the taking of evidence. The judge thus has a discretionary power of assessment and any person refusing to communicate a document risks incurring damages, or even an injunction to produce such evidence under penalty of payment (Art. 10 of the Civil Code; Art. 134 of the CCP).

10. Proof of the facts on which the resolution of the dispute depends may be made by all means, provided done so fairly. Fairness of evidence is today an essential principle of French law. More specifically, proof may be established by written or oral testimony. In this context, witnesses may be heard in the presence of the parties and their counsel (Art. 208 and 209 of the CCP). Any person who is legally summoned to testify is bound to do so (Art. 206 of the CCP). Defaulting witnesses and those who, without any legitimate reason, refuse to testify, may be ordered to pay a civil fine (Art. 10 of the Civil Code; Art. 207 of the CCP).

11. More generally, evidence may be established by investigatory measures ordered by a judge upon request of the parties or *sua sponte*. The principal investigatory measure is a court-ordered expert proceeding. Such proceeding is ordered almost systematically whenever the matter is complex and

4

raises technical issues, such as in the case of an air accident (cf. S. Thouvenot, L'expertise judiciaire en matière aéronautique [Court-Ordered Expert Proceedings in Aeronautic Matters], RFDA 1977, 231).

The purpose of a court-ordered expert proceeding is to enlighten the judge with respect to a purely technical issue requiring complex investigations; the expert, however, may not make any legal findings (Art. 238 of the CCP). The judge decides on recourse to an expert proceeding and determines his mission (Art. 263 *et seq.* of the CCP). The whole of the expert proceeding operation is placed under the control of the judge who may even take part in such operation. The expert has the widest latitude in performing his mission, provided that he limits himself to the factual issues submitted to him. Moreover, just as the judge who appointed him, he is bound to comply with the adversarial principle. Consequently, he must call the parties and their counsel to expert proceeding operations. If the expert carries out technical investigations outside the presence of the parties, he must submit them to the parties before filing his report in order to allow them to make their arguments. More generally, the adversarial principle obliges the expert to take the parties' observations or claims into consideration. The parties must promptly deliver all documents to the expert that he deems necessary for carrying out his mission. In order to perform his mission the expert may take the initiative in obtaining the opinion of another technician. Once the expert proceeding operations are completed the expert must file his report with the secretariat of the court. This report must contain the expert's opinion on each of the points of the mission entrusted to him, describe the operations he carried out and include an annex of the documents that may have been transmitted to him and on which he based his opinion, as well as the observations sent him. The expert's report is not binding on the judge but is a major element in his assessment of the facts.

12. As concerns obtaining evidence in the Comoros Islands, the place of the accident, the following remarks must be made in the absence of any bilateral cooperation treaty in this regard.

A French judge may not himself carry out any investigatory measures outside of his national territory. In order to mitigate such powerlessness, a French judge may however delegate his powers to a foreign judge and thus have recourse to the technique of international letters rogatory (Articles 733 *et seq.* of the CCP). In that the Comoros is a French-speaking country, where French law was applied for a long time and, in some matters, still applies, such technique does not appear illusory. Moreover, diplomatic action should be counted on due to the close political and economic links existing between France and the Comoros Islands.

13. It should be added that in the present case, in accordance with international rules (Chicago Convention of December 7, 1944, Annex 13), the Comoros Islands opened a safety investigation in which the following countries are taking part: Yemen, the State of registration and operation of the aircraft, France, the State of design and manufacture of the aircraft, and the United States, the State of original certification of the aircraft engines.

The gathering of facts is being carried out within the framework of the investigation commission set up by the Comoros Islands. Only those authorities in charge of the investigation may disclose its progress. France (cf. Bureau d'Enquêtes et d'Analyses [Office for Investigations and Analyzes], BEA) is very involved in this investigation; it has financed underwater searches in an amount of nearly three million euros. Investigations being conducted in this connection have enabled flight recorders to be recovered and read. According to a point of information made on June 30, 2010 by BEA, «reading of

5

the flight recorders have enabled the circumstances leading to the accident to be known without, however, determining the causes thereof, which can only be done by continuing the investigation». Since then, France has officially requested the Comorian authorities to keep it informed in respect of the progress of the investigation (see letter of July 5, 2011 from the Director of the BEA). French public powers have also expressed their concerns on several occasions concerning the progress of the investigation (cf. statements from the Secretary of State for Transportation).

**IV. The actions pending before French courts.**

14. On August 31, 2009 a summons was served on Yemenia in France by a certain number of plaintiffs (52) to appear before the District Court of Paris with a view to a finding that the contractual liability of said company for the death of certain victims could not be seriously disputed and accordingly to obtain interim payment of future damages. The action was instituted on the basis of Articles 17 and 22 of the Warsaw Convention, European Regulation 2027/97 of October 9, 1997 On Air Carrier Liability in the Event of Accidents and the provisions of Article 809 of the CCP. Pursuant to an interlocutory order dated October 16, 2009 the Presiding Judge of the District Court of Paris ordered mediation pursuant to Articles 131-1 *et seq.* of the CCP. Considering the domiciliation of the Yemenia company in Paris (16 avenue de l'Opéra, 75001 Paris), the jurisdiction of the District Court of Paris was not raised.

15. On November 27, 2009 a summons was served on Yemenia in France by a certain number of surviving beneficiaries (256) of certain deceased passengers (50) to appear before the District Court of Aix-en-Provence with a view to having such company ordered to make an interim payment of compensation for their moral prejudice and economic loss.

Jurisdiction of the District Court of Aix-en-Provence was acknowledged on the basis of Art. 33 of the Montreal Convention which provides that an action for damages may be brought, at the option of the plaintiff, in the territory of one of the States Parties, either before the court of the domicile of the carrier or of its principal place of business or where it has a place of business through which the contract has been made, or before the court of the place of destination, or before the court of the place of the principal residence of the passenger and to or from which the carrier operates services for the carriage of passengers by air.

Jurisdiction of the District Court of Aix-en-Provence was not raised with respect to the passengers having a French (Marseille) round trip flight, via Yemen (Sanaa), Comoros (Moroni) and Yemen (Sanaa), as the French (Marseille Provence) airport, the place of departure of the flight with respect to the concerned parties, is located within the jurisdiction of the District Court of Aix-en-Provence.

Jurisdiction of the District Court of Aix-en-Provence was raised with respect to those passengers having a French (Paris) round trip, via Yemen (Sanaa), Comoros (Moroni) and Yemen (Sanaa). The Court, however, found that it had jurisdiction by finding that these passengers had their principal and permanent residence in France and that accordingly they could submit the matter to the French court of their choosing, whereas Yemenia operates air carrier services in France.

6

Jurisdiction of the District Court of Aix-en-Provence was raised with respect to four passengers subject to the Warsaw Convention and for whom none of the grounds for jurisdiction under Article 28 of the Warsaw Convention had been established.

For the majority of plaintiffs, the action was brought based on the Montreal Convention, which applies to any transportation for which the point of departure and the point of destination are located within the territory of a sole party State if a stopover is to be made within the territory of another State, even if such State is not a party to the Convention. Indeed, for such plaintiffs, according to the provisions of the agreement, the flight was from Marseille (or Paris) to Marseille (or Paris), with a stopover in Yemen (Sanaa), Comoros (Moroni) and Yemen (Sanaa). France has ratified the Montreal Convention as opposed to the Comoros Islands. Yemenia has not challenged application of the Montreal Convention with respect to these plaintiffs.

For certain plaintiffs, however, the action was brought based on the Warsaw Convention, which applies to any transportation whose point of departure and destination are located within the territory of two party States. Indeed, with respect to these plaintiffs the flight was from Comoros to Comoros (via Sanaa) or from Yemen to Comoros, the conditions for applying the Warsaw Convention thus being fulfilled.

On April 30, 2010, after holding that it had jurisdiction, the District Court of Aix-en-Provence found, based on Article 17 of the Montreal Convention, that the very principle of the carrier's liability could not be disputed except for a passenger traveling under a false name. The Court then recalled that in accordance with French law, both moral prejudice and economic losses would be compensated to the extent that they were certain and direct. The Court also held that an *ad litem* provision (of 1,000 euros) must be awarded to each plaintiff and that a sum of 600 euros was to be awarded by way of unrecoverable costs (Art. 700 of the CCP). Lastly, after assessing the respective situation of each of the plaintiffs, the Court awarded interim payments in variable amounts depending on the plaintiffs, to be applied to the compensation due for moral prejudice and economic losses.

The District Court of Aix-en-Provence made the same analysis on the basis of Article 17 of the Warsaw Convention with respect to the concerned passenger, pointing out that the surviving beneficiaries of this passenger could not obtain more than the coverage ceiling promulgated by the Warsaw Convention in summary proceedings.

16. On February 17, 2011, the Court of Appeals of Aix-en-Provence upheld the decision of the lower court with respect to most of the plaintiffs. After having discussed the provisions of Articles 17 and 21 of the Montreal Convention, the Court noted that it is undeniable that the burden of proof of facts exonerating Yemenia's liability with respect to damages in excess of 100,000 Special Drawing Rights per passenger was incumbent upon Yemenia; thus the causes of the accident were still unknown and pursuant to Article 809 of the CCP, it had to be found that the obligation of the carrier could not be seriously disputed up to the exchange value of 100,000 Special Drawing Rights per passenger. The Court also ordered Yemenia to pay the surviving beneficiaries of each victim 4,000 euros by way of an *ad litem* provision and 2,000 euros for the unrecoverable costs incurred before the lower court and on appeal.

The Court furthermore examined certain special cases (claim for an unidentified passenger; concrete assessment of the moral prejudice and/or economic loss with respect to certain victims).

17. In addition to the actions referred to at paragraphs 14 to 16 above, having led to decisions that I could examine, surviving beneficiaries of other passengers brought, in similar terms, summary proceedings and on the merits against Yemenia before the District Courts of Aix-en-Provence, Paris and Marseille. These actions gave rise to twelve interlocutory decisions.

18. Furthermore, in July 2009, a criminal investigation was begun in France before the District Court of Bobigny with a view to determining the causes of the accident. Two French judges are in charge of the criminal investigation and have appointed several experts who issued an initial progress report during the first quarter of 2011. However, such report is not public.

It should be noted that the institution of a criminal proceeding has certain advantages for the parties involved. Thus, being a civil party to a criminal proceeding enables victims or their relations to obtain from the investigating judge, assisted by experts, that proof needed for establishing fault, if any. By taking part in the investigation, civil parties have access to those reports and conclusions of the experts filed in the criminal proceeding. Civil parties are not bound by investigation secrecy. It should be added that in accordance with Articles R 155 *et seq.* of the Criminal Procedure Code, a request may be made to the Public Prosecutor for authorization to deliver copies of the criminal file exhibits for the purposes of a civil proceeding.

## V. International jurisdiction of French courts.

19. In the event that the defendant (ILFC) were summoned before a French court whose jurisdiction it would not challenge, the court to which the matter would be submitted could not *sua sponte* raise its lack of jurisdiction. Indeed, articles 92 and 93 of the CCP afford, under certain conditions, the possibility for the court to which a dispute is referred, to *sua sponte* decline jurisdiction only if another court has exclusive jurisdiction to rule on the dispute. An example of such exclusive jurisdiction would be the case of an international convention conferring exclusive jurisdiction on a given court to rule on a dispute: such as with claims against an air carrier under the Warsaw Convention or the Montreal Convention which confers exclusive jurisdiction with respect to such actions.

It should be pointed out that the Court of Cassation clearly decided that a French court could *sua sponte* raise its lack of jurisdiction only if a public policy rule of jurisdiction exists, that is to say, in respect of international matters, only when a foreign court has exclusive jurisdiction (Cass. 1st civ. Dec. 16, 1986, Bull. civ. I, no. 300). To my knowledge no French case law precedent exists in which a court has held *sua sponte* that it lacked territorial jurisdiction when the defendants had expressly consented to the jurisdiction of French courts and absent the exclusive jurisdiction of a foreign court.

It should be added that Article 24 of European Regulation 44/2001 On Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters provides that, «apart from jurisdiction derived from other provisions of this Regulation, a court of a Member State before which a defendant enters an appearance shall have jurisdiction». In other words, Article 24 of the Regulation authorizes the extension of jurisdiction of the court of the Member State before which a defendant voluntarily enters an appearance unless the purpose of such appearance is to challenge the

8

jurisdiction of the court to which the case is submitted or another court has exclusive jurisdiction (see, moreover, very much in support of the extension of jurisdiction, CJEU May 20, 2010, case C-111/09, Rev. crit. DIP 2010, 575, note Pataut, deciding that violation of the rules of special jurisdiction for the protection of a weak party is not an impediment to the voluntary extension of jurisdiction). To the extent that the Regulation has not posed any condition relating to the parties' domicile, the question may be raised as to whether extension of the jurisdiction of the court to which a case is submitted is allowed even in the absence of any connection to the European Union (v. H. Gaudemet-Tallon, Compétence et exécution des jugements en Europe [Jurisdiction and Enforcement of Judgments in Europe], no. 164).

In any event, no public policy rule exists granting exclusive jurisdiction to American courts to rule on actions against the defendant arising from the Yemenia flight accident off the coast of the Comoros Islands. Consequently, it is my opinion that if the plaintiffs bring their actions in France the court to which the matter is submitted cannot decline jurisdiction *sua sponte* to rule on such actions. This would most certainly be the case if the defendant enters an appearance without challenging such jurisdiction. The absence of a challenge to jurisdiction of French courts may be implied and result merely from taking part in the proceeding. It may also be express and result from the defendant's clear and specific expression of his will. In the case at hand, it is my understanding that in the event that the action in the United States is dismissed and is subsequently brought before a French court, the defendant would consent to the jurisdiction of such court. In such a case, the court of first instance to which the matter was submitted could not decline jurisdiction. This would be the case regardless of whether the plaintiffs were French or foreign.

20. In any event, taking the circumstances of the case into account, a French court may be found to have jurisdiction based on one of the following criteria:

i) in tort matters, the international jurisdiction of a court is based on Article 46 of the CCP pursuant to which the plaintiff, at his choosing, may bring his case, apart from the court of the place where the defendant resides, before the court of the place of the event causing liability or that in the jurisdiction of which the damage was sustained. It could be imagined that whenever an action is brought by the family or relations of a victim and such individuals claim compensation for their personal loss, in reality the damage is sustained in the place of their domicile and not where it occurred. Nevertheless, under internal law, a decision of the Court of Cassation has held otherwise (Cass. 2nd civ. Jan 11, 1984, Bull. civ. II, no. 4). The fact remains that the autonomy of the compensation of indirect losses in  relation to the compensation of the loss of direct victims is a solution defended by numerous legal commentators, both in internal law (see G. Viney, L'autonomie du droit à la réparation de la victime initiale [The Autonomy of the Right to Compensation of the Initial Victim], D. 1974, Chron. 3; also G. Viney and P. Jourdain, Traité de droit civil [Civil Law Treaty], Les conditions de la responsabilité civile [Conditions of Civil Liability], 3rd ed., LGDJ, no. 321), and in international law. More specifically, in international law a well known thesis maintains that, considering its specificity, the compensation of indirect losses must not be governed by the law of the place where the damage occurred, but the law of the place where compensation of such loss must be ensured (O. Boskovic, La réparation du préjudice en droit international privé [Compensation of Loss Under International Law], LGDJ 2003, pref. P. Lagarde, no. 320).

MARA SCAGLIONE
Expert
Traducteur-Interprète
Cour d'Appel de Paris
Italien-Anglais-Français
Tél. 01 69 31 42 02
8, ch. du Clottnet - 91140 Villebust

9

ii) Moreover, the jurisdiction of a French court may be based on the provisions of Article 42, paragraph 2 of the CCP. This text makes reference to the hypothesis where there are several defendants, which corresponds to the present case. Indeed, the victims are acting both against the air carrier and against the lessor/owner of the aircraft. It is furthermore possible that they will act against the manufacturer and the equipment manufacturer, which has not been done as of the date hereof.

As concerns the action against the air carrier, jurisdiction of French courts cannot be disputed (see *supra*, no. 15). Article 42, para. 2 provides that whenever there are several defendants the plaintiff, at his choosing, may submit the action to the court of the place where one of them resides. Pursuant to this provision, which may be transposed to international matters (Cass. 1st civ. May 4, 1976, Bull. civ. I, no. 152; Cass. com. April 13, 2010, Bull. civ. IV, no.  77), to the extent that various claims brought against various defendants maintain a close link between them, whenever a court has territorial jurisdiction with regard to one of the defendants, the same holds true for the others. The fact that the air carrier is not domiciled *per se* within the French territory but merely has an establishment in France, should not change anything. Indeed, case law has clearly let it be understood (cf. Cass. com. July 20, 1981, Bull. civ. IV, no. 324) that a plaintiff can bring a co-defendant before a court whose jurisdiction is «territorial» in nature, a criteria which is wider than domicile alone.

It is a fact that current French case law holds that by requiring, in an exclusive manner, that an action against an air carrier must be brought before certain courts, the terms of Article 28 of the Warsaw Convention necessarily rule out that another court can hear the matter (Cass. com. Nov. 12, 2009, no. 08-15.269; also Cass. 1st civ. July 11, 2006, Bull. civ. I, no. 379). Under these circumstances, if the victims of an air transportation accident decide to bring their action before the court of the registered office of the manufacturer or owner/lessor of the aircraft, the court to which the matter is referred does not have jurisdiction to rule on the action brought, previously or subsequently, against the carrier as the court to which the action against the manufacturer is brought lacks jurisdiction based on Article 28 of the Warsaw Convention or Article 33 of the Montreal Convention to rule against the carrier. Indeed, there is no express provision in the Warsaw Convention or in the Montreal Convention according to which the court having jurisdiction to rule on the claim brought against the manufacturer or the owner/lessor of the aircraft also has jurisdiction to rule on a related claim brought against an air carrier.

However, pursuant to Article 42, para. 2 of the CCP, the French court having jurisdiction to rule on a claim brought against an air carrier may also be competent to rule on related claims brought against the owner/lessor and manufacturers of the aircraft. Once again, in the international system, link is a ground for the jurisdiction of French courts.

21. It should be added that in the event that the plaintiffs initiate an action against the owner of the aircraft (or against the manufacturer and equipment manufacturer) before a French court other than the District Court before which the action against the carrier has been brought, pursuant to Article 101 of the CCP such French court must decline jurisdiction and transfer the matter as it stands to the other District Court. This text in fact provides that: «if there exists between matters brought before two distinct courts a connection such as there is an interest of good justice to have them examined

10

and judged together, one of the courts may be asked to decline its jurisdiction and transfer the matter as it stands to the other court.»

## VI. Aspects of French substantive law.

22. Under French law, the victims of losses sustained due to the fault of the lessor of an aircraft or a manufacturer or equipment manufacturer may bring an action for damages based on various provisions.

23. An action could be founded on Article 1382 of the Civil Code. The plaintiffs would thus have to prove a fault on the part of the defendant, their loss and the causal connection between the fault and the loss. Fault is characterized in the event of breach of a preexisting obligation: failure to comply with a safety rule, non observance of a legal or regulatory provision or, more generally, breach of the duty of prudence or due care. Fault may consist of a positive act or failure to act. In all cases the burden of proof is on the plaintiff. Trial court judges have sovereign power in making a factual finding from which they conclude that a fault exists; in any event, they must characterize said fault in order that the Court of Cassation can exercise its control (Cass. 2nd civ. Nov. 24, 1955, D. 1956, 163).

24. An action could also be based on Article 1384, para. 1 of the Civil Code. The plaintiffs must accordingly establish that the res in the custody of a person caused the damage. The custodian of such res accordingly assumes liability ipso jure. The application of Article 1384, para. 1 of the Civil Code necessarily implies that the plaintiff prove that the res played a causal role in the occurrence of the damage. An inert res cannot be considered as having been the cause of the damage unless it is proved that it occupied an abnormal position or was in poor condition.

With respect to the custody of the res, it is established by the powers of surveillance and control over said res. French law makes a distinction between custody of the structure and the use made of the res. It can accordingly be considered that the manufacturer of a bottle (filled with a gaseous drink) which exploded due to an unknown reason, is liable for the damages caused as custodian of the structure of the res. In other words, the manufacturer is presumed to have maintained custody of the res in spite of its successive sales. However, if the damage is tied to the very use of the res, only that person having control of the use thereof may be held liable.

25. As concerns compensation of the victims, it should be noted that with respect to the required characteristics of the loss to be established by the plaintiff, French law applies the following four criteria: it must be personal, direct, certain and lawful.

In particular, considering the personal nature of the loss, the surviving beneficiaries may first of all bring a survival action to obtain compensation of the loss sustained by the deceased. They may thereafter bring a personal action to obtain compensation of their own losses induced by the death. These are known as indirect damages, constituted both by an economic loss due to the loss of family support and moral prejudice.

11

Amongst the economic and property losses, the surviving beneficiaries may obtain compensation for financial losses that have been sustained. They may also obtain compensation for lost income (losses of resources due to the accident; loss of the professional resources of the deceased victim). In this regard, trial court judges have the power of *in concreto* assessment. The indirect loss of the professional resources of the surviving beneficiaries themselves may be remedied: such is the case of a brutal accident at the origin of a depression.

Moreover, a long line of case law allows for remedying the moral prejudice of the relations of a victim who has died in an accident (Cass. civ. Feb. 13, 1923, D.P. 1923, 1, 52). Accordingly, the disturbance, such as the pain resulting from the disappearance of someone who is dear, may be remedied. It is up to the trial court judges to assess such loss by taking into consideration all the circumstances of the case (Cass. 2nd civ. Nov. 28, 1962, D. 1963, 77).

26. Actions in tort are time-barred under the conditions of common law. In this regard, Article 2224 of the Civil Code provides in a general manner that personal actions are time-barred after five years as from the day that the holder of a right knew or should have known of those facts allowing him to bring such action.

Article 2226 of the Civil Code provides that an action for liability that has arisen from an event having entailed bodily harm, instituted by the direct or indirect victim of the losses resulting therefrom, is time-barred after ten years as from the date of the consolidation of the initial or aggravated damages.

It should be added that nothing can prevent such time limit from being voluntarily extended by the parties (Art. 2254 of the Civil Code). Moreover, nothing prevents the defendant himself from waiving the benefit of the statute of limitations, unless vested (Article 2250 of the Civil Code). In the same manner, the parties have full freedom to decide by means of mutual agreement to suspend the statute of limitations (Articles 2254, para. 2 and 2234 of the Civil Code).

**Conclusion**

27. In France, District Courts are the common law courts of first instance with respect to liability actions brought by individuals. Jurisdiction of French courts to rule on actions brought in the United States against ILFC by virtue of the accident to the Yemenia flight is based on multiple grounds.

ILFC may expressly or impliedly decide to submit itself to the jurisdiction of French courts. If ILFC consented to the jurisdiction of a French District Court such court would not have the power to decline jurisdiction *sua sponte* since no foreign court has exclusive jurisdiction to rule on actions brought against ILFC (Art. 92 of the CCP; Article 24 of European Regulation 44/2001 also forms a basis for such solution). This would be the case regardless of whether the plaintiffs are French or foreign.

Actions may also be brought before the court in the jurisdiction of which the plaintiffs sustained their loss (Art. 46 of the CCP). Even if French case law is not favorable to such an opinion, there is nothing

EXHIBIT A, PAGE 000054

prohibiting considering that the French plaintiffs sustained their loss at the place of their residence in France, thus enabling such French plaintiffs to initiate their action in France.

Furthermore, French jurisdiction can be grounded in Article 42, para. 2 of the CCP to the extent that a claim made against ILFC is related to a claim brought against the carrier, it being noted that in the present case jurisdiction of French courts cannot be disputed concerning the action against the carrier.

28. Accordingly, the jurisdiction of a French court to rule on an action for damages brought by the plaintiffs against ILFC is grounded in various bases and cannot be disputed. Moreover, such court cannot decline its jurisdiction if ILFC expressly or impliedly agreed to submit itself to the jurisdiction of such French court.

29. The plaintiffs could obtain the joinder of the action brought against ILFC with the proceeding currently pending before the District Court of Aix-en-Provence against Yemenia. If they bring an action against ILFC before another District Court, pursuant to Article 101 of the CCP in all probability such action would be transferred to the District Court of Aix-en-Provence.

30. Under French law, claims for compensation brought against the lessor of an aircraft or its manufacturer or equipment manufacturer may be made pursuant to Articles 1382 and 1384, para. 1 of the Civil Code based on liability for fault or liability for damages caused by a *res.* Plaintiffs may bring an action for compensation of a loss sustained by the deceased and their personal loss whether the losses are pecuniary or non-pecuniary.

31. In the present case, the fundamental principles of French civil procedure would ensure the fair, adversarial and exhaustive nature of the legal proceedings. Considering, in particular, the principle of the dual degree of jurisdiction and the possibility of recourse before the Court of Cassation, the parties have the widest possibility to assert their legal and factual arguments and submit their evidence to the judge and the other parties. Proof is produced to the French judge either orally or in writing. The judge has available to him the procedural means to enjoin the parties or third parties to produce documents in their possession under penalty of payment and a civil fine. A French judge may also appoint an expert to enlighten him with respect to any technical issue on which the outcome of the dispute may depend (whether the issue is purely technical, medical or economic as concerns assessment of loss).

32. Furthermore, an action in France would allow one and the same court to examine the actions brought against all of the potentially responsible parties and rule on all issues relating to the liability incurred following the Yemenia accident. In particular, several hundred of plaintiffs have already brought actions before the District Court of Aix-en-Provence in order to obtain full compensation from the Yemenia company for the losses resulting from the death of the passengers in the air catastrophe.

Moreover, these plaintiffs have already obtained interim payments to be applied against final compensation. It is a fact that the liability of the airline, both on the basis of the Montreal Convention and the Warsaw Convention, is at the heart of the French civil proceeding.

33. In addition, a criminal investigation is pending before the District Court of Bobigny in order to determine the causes of the accident, as well as any possible criminal liability. The investigating judge

has the widest powers to gather that evidence which is necessary for his investigation. Such evidence could be used within the French civil proceeding.

34. It should finally be noted that the Comoros Islands are part of the French-speaking community, that pursuant to Article 1 of the Comoros Constitution French is an official language, and that they are part of the OHBLA (Organization for the Harmonization of Business Law in Africa).

It should be added that there is a large Comorian community in France, specifically in the south and Marseille. In spite of the independence of the Comoros Republic proclaimed in 1975, very close links continue with France, based on a common language, French, significant economic and political exchanges and the proximity of the Mayotte Island which forms part of the Comoros archipelago, but which island remained French and is today a French department.

35. Based on the foregoing, I therefore consider that the French legal system affords the plaintiffs an accessible and suitable forum to rule on their actions against the ILFC company.

36. I hereby represent, under pain of perjury in accordance with the laws of the United States of America, that this attestation is accurate and truthful.

Done in Paris, February 3, 2012

(Signature)

Philippe Delebecque



14

APPENDIX 1

Resume

Name :              DELEBECQUE
Surname:           Philippe
Date of birth :     May 18, 1954 (La Roque s. Pernes,Vaucluse)
Nationality :       French
Marital Status :   Married, two children
Address :          4, rue de la Paix – 75002  Paris
Phone :            (33) 01 42 60 35 60 – fax (33) 01 42 60 35 76 – mob. 06 11 88 37 57
e.mail :           ph.delebecque@wanadoo.fr

Profession:        Full Professor, University of Panthéon-Sorbonne (Paris-I), Law School

Doctorat d'Etat (PhD) : Thesis "Exemption clauses" – Aix-Marseille University, Law School, 1981
Agrégé (lecturer) at the law faculties (private law – criminal sciences) 1982

Professor at the Indian Ocean University (1983-1986)
Dean of the Faculty of law and Economic Sciences

Professor at Aix-Marseille III University, 1986-1992
Director of the Judiciary Studies Institute
Director of the Post-graduate specialist International Trade Law degree programme

Paris-I (Pantheon-Sorbonne) University, since 1992
Director of the Contracts and Real Estate Master's Degree programme

Member of National Council Bar Committee (1997-2000)
Member of National Committee of Universities (2000-2004)
Member of National Private Law Board of Examiners for admission as a University Lecturer ("Agrégation") (2003 competition / 2008 competition)
Member of the Board of Examiners for the Ecole Nationale de l'Administration (ENA) (1986-1989)
Member of Board of Examiners for admission as a University lecturer ("Agrégation") (CAMES – Africa  (1987, 1989, 1991, 1993)

Main subjects taught:
Civil Law, Maritime law, Air and transport law, International Trade Law

Main publications:
.« Cours de droit civil (1. Le contrat (Contract) ; 2. La responsabilité (Liability) ; 3. Le régime des obligations » (law of Obligations), Litec ;
.« Droit civil, Les sûretés » (guarantees), précis Dalloz (with. Prof. Simler)
.« Droit des contrats civils et commerciaux » (civil and commercial contracts), précis Dalloz (with F. Collart) ;
.« Droit maritime » (Maritime law), précis Dalloz (for 2012) ;
." Droit du commerce international"(International Trade Law), précis Dalloz, (with JM. Jacquet).
.« Droit commercial, Traité de Ripert et Roblot vol. 2 (with M. Gemain);
. « Traité de droit transport (Transport law) LGDJ, (being prepared)

Contributor to the following reviews :
          "Droit maritime Français" (DMF)
          The "Revue trimestrielle de droit commercial" (International trade law)
          The "Revue des contracts" (Special contracts chronicle)
          The "Semaine Juridique" (Law of Guarantees chronicle, with M. Simler)
          The "Revue de droit des transports"



Contributor to Juris-Classer civil and the Répertoire Dalloz (Civil and commercial law).
Director of "Juris-Classeur Transports" ;
Co-Scientific Director of "Revue de droit des transports".


Visiting Professor : Universities of  Tananarive, Mauritius, Yaoundé, Dakar, Douala, Cairo, Tunis, Oran, Tlemcen, Casablanca, Thessalonica, Milan, Bologna, Sarrebrück, Porto-Alegre, Bogota, Montreal, Chuo, Shanghai, International Development Law Institute, Rome ; Academy of International Law, The Hague.


Member of French Marine Academy
President of Maritime Arbitration Chamber of Paris
President of French Association of Air and Spatial Law
Vice-President of French Maritime Law Association
Director of the Mediterranean Maritime Transport Institute

Expert for the World Bank
Expert with the International Maritime Organization
Expert for the National Transport Board
Expert for the French Foreign Affairs Ministry (UNCITRAL – Transport law)
Arbitrator  (Maritime Arbitration Chamber ; Paris International Court of Arbitration, ICC, AFA)
Ex-Member of the Board of Governors of the World Maritime University (Malmoe)


Town councilor for la Rocque sur Pernes (Vaucluse)

Certifié conforme à l'original :
N° d'inscription : 12- 910
Écrit en langue : française
Fait le : 09/02/2012